UNITED STATES of America,
Plaintiff,

v.

Mark A. KILPATRICK and Michael
G. Ross, Defendants.

No. 4:04CR3091.

United States District Court,
D. Nebraska.

Dec. 7, 2004.

694

Alan L. Everett, Assistant United States Attorney, Lincoln, NE, for Government.

Robert B. Creager, Anderson, Creager Law Firm, Lincoln, NE, for Defense.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is an interesting appeal in a misdemeanor criminal case in which the defendants waived a jury (filing 8[1]) and consented to proceed to trial and sentencing before Magistrate Judge Piester (filing 8). Judge Piester found the defendants guilty, and he sentenced them to probation and fined them. They now assert a timely appeal. *See* 18 U.S.C. § 3402 (providing for appeals to the district court for judgments of conviction rendered by magistrate judges); 18 U.S.C. § 3742(h) (providing for appeals to the district court for sentences imposed by magistrate judges).

The defendants argue that: (1) Judge Piester erred in failing to grant the defendants' Rule 29 motion for judgment of acquittal; (2) the evidence was insufficient to support the convictions on Counts II and III; and (3) the terms and conditions of probation are excessive and constitute an abuse of discretion. (Filing 42, at 3.)

After carefully reviewing the briefs of the parties (filings 42 & 43), the documen-

---

1. The defendants also waived their right to be represented by separate counsel and agreed that they could be solely represented by the very capable Robert B. Creager. (Filing 8.) As usual, Mr. Creager has admirably represented his clients.

tary evidence (filing 10), Judge Piester's opinions and judgments (filings 11, 18, 29, 30), and the trial and sentencing transcripts (filings 38 & 39), the judgments of conviction and sentences for each of the defendants are affirmed. Briefly, the reasons for my decision are set forth below.

### I.

The defendants were each charged with three crimes related to deer hunting. Specifically, they were charged as follows:

* Count I charged the defendants with violating 16 U.S.C. § 668dd(c) in that the defendants unlawfully entered a "closed" portion of the Goose Lake area of the Crescent Lake National Wildlife Refuge (Refuge) in Nebraska (filing 1 (violation numbers w642098 and w642099));

* Count II charged Mr. Kilpatrick (Kilpatrick) with unlawfully shooting a deer in a "closed" portion of the Refuge and it charged Mr. Ross (Ross) with unlawfully collecting that same deer from the closed portion of the Refuge, all in violation of 16 U.S.C. § 668dd(c) (filing 1 (violation numbers w642100 and w642101)); and

* Count III charged Mr. Kilpatrick with unlawfully shooting the deer as alleged in Count II and then unlawfully transporting a portion of it in interstate commerce, and that same count charged Mr. Ross with unlawfully collecting the deer as alleged in Count II and then transporting a portion of it in interstate commerce, all in violation of the Lacey Act, 16 U.S.C. § 3372(a)(1) (filing 1 (violation numbers w642102 and w642103)).[2]

Essentially, the defendants were charged with trespassing on the "closed" portion of the Refuge; shooting or taking a deer from the "closed" portion of the Refuge; and transporting a portion of the deer unlawfully shot or taken from the "closed" portion of the Refuge in interstate commerce. The defendants did not contest at trial (filing 39, at 23[3]), and do not now dispute, their guilt as to the trespass charge. (Filing 42, at 3.[4])

Most of the basic facts presented by the government at trial are not in dispute. Indeed, in their brief, the defendants make the following concessions:

For purposes of our discussion, we will first discuss the facts, which are not in dispute:

1. On or about November 21, 2002, Kilpatrick and Ross were hunting deer in the Refuge, located in Western Nebraska, a portion of which is open for deer hunting, and a portion of which is closed.

2. Kilpatrick shot a deer.

3. Kilpatrick and Ross removed the deer from the Refuge.

4. Kilpatrick and Ross harvested the deer meat and antlers; Ross taking

---

2. Because the deer was apparently shot and taken from federal lands, one doubts whether it was necessary to allege and prove *interstate* transportation in order to make out a violation of the Lacey Act. *Compare* 16 U.S.C. § 3372(a)(1) (among other things, making it unlawful to transport any wildlife taken in violation of the federal laws) *with* 16 U.S.C. § 3372(a)(2)(A) (among other things, making it unlawful to transport in interstate commerce wildlife taken in violation of the law of any state).

3. In his opening statement at trial, defense counsel conceded that the defendants "clearly admitted that they took the deer into the brushes or into the thicket off the road to skin the deer, just across the line there." This essentially admitted the operative facts of trespass.

4. "The Defendants' [sic] appeal their conviction on Counts II & III and the sentence imposed." (Filing 42, at 3.)

his share to his home in Colorado, and Kilpatrick taking his share to his home in Iowa.

5. Traces of the blood from the deer were found in an open area of the Refuge as well as in a closed area of the Refuge.

(Filing 42, at 5.)

Many other facts are undisputed. For example, the government presented the following evidence in its case-in-chief, and that evidence remained undisputed at the end of the trial:

* When Kilpatrick was interviewed on the day in question, he told an officer that the deer was shot "at the rock pile at Tree Claim[,]" but that statement did not make sense because, although there is a "Tree Claim" and a "rock pile," there is "no rock pile at Tree Claim." (Filing 39, at 132–34.) Kilpatrick also told the officer that if the officer "went up there by the rock pile, I could see where they turned around in the road and there'd be blood there." (Filing 39, at 134.) Ross made similar statements. (Filing 39, at 134.)

* The defendants each made subsequent statements to law enforcement authorities in which: (a) they admitted that the deer was shot in and taken from the Refuge and that they transported portions of it in interstate commerce; (b) they asserted that the deer was killed near a rock pile in an "open" area of the Refuge; (c) they admitted taking the dead deer into the area identified by the government as the "closed" part of the Refuge and stated that they did so for the purpose of field dressing the carcass; and (d) they stated that despite their intention to field dress the deer in the area identified by the government as "closed," they changed their minds and dragged the deer back to their truck after first unloading and dragging the

carcass off the road and into the brush. (E.g., Filing 39, at 208–214 (interview of Kilpatrick); Filing 39, at 216–19 (interview of Ross).)

* Scientific evidence positively connected the blood found at both spots to the deer killed and taken by the defendants. (E.g., Filing 39, at 64 & 237; Ex. 22 (stipulation).)

* The spot where the defendants claimed the deer was killed contained only a small amount of blood found between and near tire marks, but no evidence was found indicating that a deer had been dragged or had fallen on the ground. (Filing 39, at 144–48.) According to a witness who had 28 years of experience as a refuge officer and 30 years as a deer hunter (filing 39, at 117 & 136), the blood spatters between and near the tires suggested that a deer had been in the bed of a pickup and its blood had dripped out of the truck onto the ground. (Filing 39, at 144–45.)

* The spot where the government claimed the deer was killed contained a "blood trail" for about 25 yards. (Filing 39, at 153–54.)

* The defendants brought the dead deer to a game station, and an officer noted that there was "a lot of blood" along the torso of the deer, and "something just didn't look right." (Filing 39, at 101.) The officer discovered that "the deer was not gutted," unlike the typical way deer are presented "when hunters check them." (Filing 39, at 102.) Another officer indicated that the failure to gut the animal was "very, very unusual," particularly because the weather was warm and the failure to remove "the entrails can spoil the meat." (Filing 39, at 135.)

* The spot within the closed area of the Refuge, where the government claimed the deer was killed, was clearly marked

"unauthorized entry prohibited" and "no hunting zone." (Filing 39, at 157; Exs. 17 & 18 (photos).)

\* A witness, who lived near the "closed" area of the Refuge where the government claimed the deer was killed, testified that he heard shots on the morning in question, became concerned because the shots seemed very close to his home, and soon thereafter observed, and then reported to the authorities, a white pickup "[o]n the refuge side of the fence." (Filing 39, at 37.)

\* On the day in question, the defendants were driving a white Ford pickup. (E.g., Filing 39, at 128–29 & 136.)

\* The defendants had the head and antlers of the deer preserved by a taxidermist in Colorado. (Ex. 22 (stipulation)). Kilpatrick, who shot the deer, lived in Iowa, and Ross lived in Colorado.

The defendants both testified. (Filing 39, at 245–74 (Kilpatrick); Filing 39, at 276–87 (Ross).) In their testimony, the men essentially repeated, clarified, and amplified the statements they had earlier made to law enforcement officers on the day in question and thereafter during the investigatory stages of this case.

In a six-page opinion, Judge Piester found the men guilty. (Filing 11.) After that, he ordered presentence reports. The reports were received (filings 20 & 21), but no written objections to them were submitted. Judge Piester issued tentative findings adopting the reports. (Filings 22 & 23.) Under the Sentencing Guidelines,[5] both men were found to have a total offense level of 6 and a criminal history category of I. (Filing 24 (Sentencing Recommendation regarding Kilpatrick); Filing

25 (Sentencing Recommendation regarding Ross).)

The judge sentenced the men to probation[6] and he fined them. In particular, Judge Piester ordered: (1) Kilpatrick to serve three years of probation, to not hunt during probation, and to complete 250 hours of community service (filing 29); (2) Kilpatrick to pay fines totaling $3,500 ($500 for Counts I and II and $2,500 for Count III) (filing 29); (3) Ross to serve three years probation, to not hunt during probation, and to complete 150 hours of community service (filing 30); and (4) Ross to pay fines totaling $3,000 ($500 for Counts I and II and $2,000 for Count III) (filing 30).

Save for the fines, the sentences were imposed as unitary sentences rather than described in a count-by-count manner. As a practical matter, the probation terms are thus concurrent.

Despite the government's request, Judge Piester refused to order forfeiture of the rifle used to kill the deer. (Filing 38, at 14.) He also indicated that he would consider terminating probation early if the community service requirements were satisfied. (Filing 38, at 15.)

Seven days after the entry of the judgments, the defendants appealed. (Filings 31 & 33.) The defendants requested that I stay service of their sentences (filings 32 & 34), and I did so. (Filings 35 & 36.) The lawyers were consulted. A schedule was agreed upon, and a briefing schedule was established. (Filing 37.) The appeal became ripe on or about November 12, 2004.

---

5. The 2003 Manual was used. (Filing 20 ¶ 18; Filing 21 ¶ 18.)

6. Pursuant to the statute, a person who has been convicted of a misdemeanor may be

sentenced to probation, 18 U.S.C. § 3561(a), and the probation term may be up to five years for all types of misdemeanors. 18 U.S.C. § 3561(c)(2).

## II.

I next consider the defendants' legal arguments. In doing so, I address them in a slightly different order than the order briefed by the defendants. I review the sufficiency-of-the-evidence argument first, then I address the Rule 29 argument, and, lastly, I review the sentencing argument.

## A.

■ First, when the proper standard of review is applied, the evidence was clearly sufficient to make a case on all counts against both defendants.[7] *See, e.g.,* Federal Rule of Criminal Procedure 58(g)(2)(D) ("The defendant is not entitled to a trial de novo by a district judge. The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge."); *United States v. Rojas,* 356 F.3d 876, 878 (8th Cir.2004) (stating that "[t]o evaluate sufficiency of the evidence, we ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'" and "[w]e view the evidence in the light most favorable to the guilty verdict and accept all reasonable inferences that may be drawn from the evidence.") (em-

phasis in original) (citations omitted). *See also United States v. Welte,* 635 F.Supp. 388, 390 (D.N.D.1982) (when reviewing the sufficiency of evidence in prosecution before a magistrate judge, the district judge would view the evidence in the light most favorable to the government and the magistrate judge's decision must be sustained if there is substantial evidence to support it; National Wildlife Refuge prosecution under 16 U.S.C. § 668dd).

While the defendants argue that a judge could have concluded that the existence of the blood in the "open" portion of the Refuge between and near the tire marks corroborated the story they told and, as a result, they were not guilty, that argument is beside the point.[8] When the benefit of all the intellectually honest inferences is given to the government, a reasonable trier of fact, like Judge Piester, could have properly concluded beyond a reasonable doubt that the defendants knowingly and intentionally killed and took the deer in the "closed" portion of the Refuge, transported the carcass from the federal lands, and tried to hide those facts from the authorities.

---

7. This is true whether the record is viewed from the perspective of all the evidence or only the government's evidence presented in its case-in-chief.

8. Such a fact-finder would be unusually credulous. He or she would ignore crucial facts like the concentration of the blood between and near the tire marks and the absence of any physical evidence that the deer had been killed off the road and dragged to the pickup. Recognizing that the deer had been observed to be quite bloody when it was checked into the game station, our soft-hearted finder of fact would additionally be required to believe that the deer was placed in the pickup leaving blood *only* between and near the tires. Our kind-hearted judge of the facts would also be required to accept as believable the defendants' explanation that they drove the unusu-

ally fastidious, but then dead, deer to a clearly posted "entry prohibited" and "no hunting" area, and lugged the heavy animal off the pickup and into the brush in order to dress the carcass, all the while leaving a blood trail quite unlike the scene of the shooting. After swallowing that part of the story, our mythical judge would accept the defendants' final flourish: Despite all that effort, the men suddenly came to the realization that they had been mistaken and it was not appropriate to disembowel the animal after all, so they dragged the heavily bleeding trophy back to the pickup and innocently drove off and out of the "closed" portion of the Refuge. After that, our gentle judge would see no oddity in the fact that Kilpatrick, who lived in Iowa, shot the deer, but Ross made the preservation arrangements with the Colorado taxidermist.

Frankly, the government's evidence was overwhelming. The physical facts—the shots heard near the posted area; the defendants' white pickup; the observation of a white pickup in the posted area shortly after shots were heard; the "entry prohibited" and "no hunting" sign in the posted area; a long "blood trail" in the posted area; the scientific evidence that linked the deer killed by the defendants to the trail of blood found in the posted area; and the defendants' highly unusual failure to gut the deer—provided a concrete foundation for the government's case. The defendants' statements,[9] offered in evidence by the government in its case-in-chief, admitted many, if not all, of the operative facts necessary for the convictions. In other respects, the defendants' statements offered during the government's case-in-chief were as self-serving as they were strange and thus strongly tend to prove guilty intent and guilty knowledge.[10] In short, the evidence was both ample and adequate.

## B.

■ Second, the defendants argue that Judge Piester erred by denying their Rule 29 motion for judgment of acquittal. *See* Federal Rule of Criminal Procedure 29(a) (providing for motions for judgment of acquittal when "the evidence is insufficient to sustain a conviction . . . .") As I shall next

explain, the defendants' argument has no merit.

At the close of the government's case (filing 39, at 241), the defendants made their motion, and, at the suggestion of their counsel (filing 39, at 239),[11] Judge Piester reserved ruling on the motion. (Filing 39, at 241.) *See* Federal Rule of Criminal Procedure 29(b) ("The court may reserve decision on the motion . . . . If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."). However, Judge Piester did not rule upon the motion before he found the defendants guilty.

After Judge Piester found the defendants guilty, and within seven days of the judge's written decision finding them guilty, defense counsel apprised the judge of the failure to rule upon the earlier motion and counsel renewed and reasserted the Rule 29 motion. (Filings 12 & 14.) Several months before the defendants were sentenced and the judgements were entered, the judge acknowledged that he had not ruled upon the earlier Rule 29 motion, and then, in a written opinion, Judge Piester reviewed the sufficiency of the evidence at the end of the government's case-in-chief, and he concluded that it was sufficient. (Filing 18.) After deciding that the government's case was sufficient, he also noted that the defendants' trial testimony, given, obviously, after the government presented its case, "did not

---

**9.** Under Federal Rule of Evidence 801(d)(2)(A), a defendant's statement is not hearsay when it is offered by the government against the defendant; indeed, the statement is received for substantive purposes. 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801.30[1], at 801–46 & n. 6 (2004) (collecting cases). "Party admissions commonly admitted into evidence include a defendant's statements to police . . . ." *Id.* § 801.30[2], at 801–53 & n. 20 (collecting cases).

**10.** To determine the sufficiency of the evidence, I need not decide the precise level of culpability that the government was required to prove in order to make a case under each of the three counts. Suffice it to state that the evidence is sufficient for a conviction of both defendants on all counts no matter what level of intent or knowledge the underlying statutes require.

**11.** "So one way to do it would be to make a pro forma motion, take it under advisement and let me go forward." (Filing 39, at 239.)

create reasonable doubt," but rather "cemented the facts established by the government's case." (Filing 18, at 2.) As a result, and although he had previously found the defendants guilty, the judge denied the Rule 29 motions. Over the following months, the case then proceeded to sentencing.

Initially, the defendants cannot assert that Judge Piester erred in the timing of his decision to deny the Rule 29 motion. In fact, nothing in the words of Rule 29 precluded Judge Piester from reserving and then denying the Rule 29 motion *after* first finding the defendants guilty,[12] so long as when he denied the motion he did so "on the basis of the evidence at the time the ruling was reserved." Federal Rule of Criminal Procedure 29(b).[13] Since Judge Piester explicitly followed this standard (filing 18, at 2), there was no procedural error.

Regarding the substantive question of whether the government's evidence was sufficient when it rested its case-in-chief, there was also no error. As I have indicated earlier, the government's evidence was more than adequate.

### C.

█ Finally, the defendants argue that Judge Piester abused his discretion when he sentenced them to probation and fined them. They claim the sentences were excessive. In particular, the defendants argue that the fines and probation, taken together, were too harsh, and the length of probation, including the bar on hunting, particularly as it pertains to Mr. Ross, was unnecessarily punitive. While these issues are technically more complex than they might first appear, there was no error.

In order to set the stage, a number of initial observations are in order. To begin with, the sentences imposed by Judge Piester were within the Guidelines to the extent the Guidelines were applicable. (Filing 20 ¶¶ 55–70 (Kilpatrick); Filing 21 ¶¶ 56–71 (Ross).) Indeed, although Judge Piester could have imposed a jail sentence under the statutes (filing 20 ¶¶ 55–56; filing 21 ¶¶ 56–57)[14] and the Guidelines (filing 20 ¶ 57; filing 21 ¶ 58), he did not do so. Furthermore, the sentences were very similar to the sentences recommended by the probation officer. (Filing 24 (Kilpatrick); Filing 25 (Ross).)[15] In addition, Judge Piester indicated that he would consider terminating the probation early if the men completed their community service early. No matter the standard of review, the foregoing tends to establish the overall reasonableness of the sentences imposed by Judge Piester.

12. However, and to be clear, Judge Piester denied the Rule 29 motion *before* he sentenced the defendants and before the judgments were entered.

13. When it comes to appellate review, the utility of a Rule 29 motion in a bench-tried case is questionable. This is because a plea of not guilty "in cases tried to the court" asks the trial judge "for a judgment of acquittal, and a motion to the same end is not necessary" when seeking appellate review of the sufficiency of the evidence. 2A Charles Alan Wright, *Federal Practice and Procedure* § 469, at 322–23 (2000) (citation omitted).

14. *See* 16 U.S.C. § 668dd(f)(1) (for knowing violations, up to one year in prison and the fine provided for in Title 18); 16 U.S.C. § 668dd(f)(2) (for other violations, up to six months in prison and the fine provided for in Title 18); 16 U.S.C. § 3373(d)(2) (Lacey Act violations of the type charged in this case must be "knowing" violations and, if so, they carry a penalty of up to one year in prison and $10,000 fine).

15. In fact, and regarding the fines in particular, the sentences were less harsh than the probation officer's recommendations. The probation officer suggested a fine of $5,000 for both men. (Filings 24 & 25.)

However, neither the government nor the defendants spend much time discussing the proper standard of review for these misdemeanor sentences. Rather, they simply argue about whether the sentences were appropriate. Before addressing that question, I must first determine what rules apply to my review of their argument. I do that next.

### 1.

The statutory authority which allows me to review the sentences is 18 U.S.C. § 3742(h). That statute provides for appeals to the district court for sentences imposed by magistrate judges. In particular, the statute states that I must review the sentences imposed by Judge Piester "as though the appeal were to a court of appeals from a sentence imposed by a district court." *Id.*

The right of defendants in the district court to appeal sentences to the court of appeals is set forth in 18 U.S.C. § 3742(a)(1)-(4). There are four grounds for appeal which, condensed, are these: (1) the sentence violated the law; (2) the sentence was imposed as a result of an incorrect application of the Guidelines; (3) the sentence, including a probation sentence, exceeds the Guideline range or imposes a more limiting condition of probation than the maximum established by the Guidelines; or (4) the sentence was imposed for an offense for which there is no sentencing guideline and it "is plainly unreasonable." *Id.* If none of these four factors is present, the court "shall affirm the sentence." 18 U.S.C. § 3742(f)(3).

With these principles in mind, I turn more directly to the proper standard of review and the defendants' arguments. I first address the Lacey Act violations and sentences. Then I address the other violations and sentences.

### 2.

The Lacey Act sentences were imposed under the Guidelines. Therefore, the first three jurisdictional "hooks" under 18 U.S.C. § 3742(a)(1)-(3) are potentially applicable; that is, the sentences violated the law, the sentences were the result of an improper Guideline application, or the sentences exceeded the Guideline range or imposed a more limiting condition than the maximum established by the Guidelines. The defendants do not argue that any of these factors exist.

However, and in order to avoid any question, I have independently reviewed the record to search for plain error and I find none. Indeed, I have reviewed the record and have satisfied myself that Judge Piester and the probation officer did not legally err. In addition, and as explained below, I find and conclude more particularly that they applied the correct offense level under the Guidelines and that there were no Guideline mistakes.

Because the potential prison term was up to one year, the Lacey Act offense is categorized as a Class A misdemeanor. 18 U.S.C. § 3581(b)(6). Under U.S.S.G. § 2X5.1, for a "Class A misdemeanor for which no guideline expressly has been promulgated," the court must "apply the most analogous offense guideline." Judge Piester and the probation officer determined that there was no guideline expressly promulgated regarding a violation of the Lacey Act, and, as a result, they followed U.S.S.G. § 2X5.1, applying U.S.S.G. § 2Q2.1(a) as the most analogous offense guideline. (Filing 20 ¶ 19; Filing 21 ¶ 19.)

At offense level 6, U.S.S.G. § 2Q2.1(a) is the lowest level for "Offenses Involving Fish, Wildlife, and Plants." *Id.*[16] In the

---

**16.** Judge Piester, in his role as sentencing judge, did not engage in any judicial fact finding that increased the applicable Guideline range. On the contrary, and as stated in

commentary to U.S.S.G. § 2Q2.1, the Manual states this guideline applies to the Lacey Act and its penalty provisions, as well as several other similar federal laws. U.S.S.G. § 2Q2.1, comment (statutory provision & backg'd). It is thus apparent that Judge Piester applied the correct offense level under the Guidelines to the Lacey Act violations.

Given the properly computed offense level of 6, and the undisputed criminal history category of I, there is nothing about the length of probation (3 years), the terms of probation (no hunting and community service of 250 hours or 150 hours), or the amount of the fines ($3,500 or $3,000) that exceed the proper Guideline ranges or limitations. *See, e.g.,* U.S.S.G. § 5B1.2(a)(1) (regarding the term of probation, providing for 1 to 5 years probation for offense levels of 6 or greater); U.S.S.G. § 5B1.3(b) (regarding the no-hunting condition, authorizing the court to impose other conditions reasonably related to the nature and circumstance of the offense); U.S.S.G. § 5B1.3(e) (regarding the community service condition, authorizing the imposition of community service as a condition of probation); U.S.S.G. § 5F1.3 & comment (n. 1) (regarding the community service condition, stating that the amount of community service should not normally exceed 400 hours); U.S.S.G. § 5E1.2(c) (regarding the fines, authorizing fines of between $500 and $5,000 for offense levels 6 and 7).

■ In short, the defendants' attack comes down to a claim that the Lacey Act sentences were too harsh. Because none of the first three criteria for review under 18 U.S.C. § 3742(a)(1)-(3) pertaining to

sentences under the Guidelines exist, I do not have jurisdiction to decide the "harshness" question for the Lacey Act sentences imposed under the Guidelines. *See, e.g., United States v. Smotherman,* 326 F.3d 988, 989 (8th Cir.) ("Absent any constitutional infirmity, we have no jurisdiction to review the district court's exercise of discretion in setting a defendant's sentence within a properly determined guidelines range."), *cert. denied,* 540 U.S. 912, 124 S.Ct. 293, 157 L.Ed.2d 203 (2003); *United States v. Woodrum,* 959 F.2d 100, 101 (8th Cir.1992) (holding that the defendant's sentence, which was imposed within the applicable Guideline range and which was not imposed in violation of law, or as a result of an incorrect application of the Guidelines, was not subject to review merely because it was at the top of the Guideline range).

But, even if I had the power and authority to review these Lacey Act sentences to decide whether they were otherwise too severe, I believe they are appropriate and I would not disturb them. *See* 18 U.S.C. § 3553(a) (factors to be considered when sentencing). As I shall discuss next, the sentences were "plainly reasonable."

### 3.

■ Because the other offenses (trespassing and shooting or taking a deer from the Refuge) carried terms of imprisonment of one year or six months, depending upon whether the violations were "knowing," they are categorized as either Class A or Class B misdemeanors. 18 U.S.C. § 3581(b)(6) & (7). The probation officer treated these offenses as Class B misdemeanors. (Filing 20 (first page of report under "Offense"); Filing 21 (first page of

---

the text, the defendants were sentenced at the lowest range applicable to these types of offenses. Thus, no matter how *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), might apply to the Guide-

lines in other contexts, it does not apply here because "[n]o additional [factual] finding was required by the district court to justify the sentence ...." *United States v. Lucca,* 377 F.3d 927, 934 (8th Cir.2004).

report under "Offense").) Judge Piester apparently agreed and this meant that the Guidelines were not applicable to these offenses. *See* U.S.S.G. § 1B1.9 ("The sentencing guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.").[17] As a result, the standard of review for these sentences is different than the standard of review for the Lacey Act sentences.

For these "lesser" charges, I must review the sentences under the provision of 18 U.S.C. § 3742(a)(4), pertaining to cases where there are no guidelines, in order to determine whether the sentences were "plainly unreasonable." *Id.* In this circumstance, the provisions of 18 U.S.C. § 3553(b) apply to the sentence imposed and helps to give meaning to the words "plainly unreasonable." That statute provides in pertinent part as follows: "In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in section (a)(2)." [18] The reference in the preceding language to the "purposes set forth in section (a)(2)" refers to 18 U.S.C. § 3553(a)(2).

Section 3553(a)(2)(A)-(D) sets forth four categories to be considered when imposing sentences. Summarized, those four factors are these: (1) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) the need to afford adequate deterrence; (3) the need to protect the public from further crimes by the defendant; and (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional services in the most effective manner.

As might be expected when the foregoing principles are put in practice on appeal, the most widely accepted operational definition of the "plainly unreasonable" standard of review is "a deferential appellate posture concerning issues of fact and the exercise of discretion." *United States v. Marvin,* 135 F.3d 1129, 1136 (7th Cir. 1998). Deferential review under the "plainly unreasonable" standard is certainly the practice in the Eighth Circuit Court of Appeals. *See, e.g., United States v. K.R.A.,* 337 F.3d 970, 978–79 (8th Cir.2003) (where an 18–year–old juvenile violated her probation for leaving a community treatment center and failed to notify her probation officer of her change in address, the Court of Appeals affirmed a 37–month sentence to juvenile detention under the "plainly unreasonable" standard; the court linked "plainly unreasonable" with "abuse of . . . discretion").

■ The Court of Appeals for the Eighth Circuit endeavors to determine whether the sentence imposed is consistent

---

**17.** I presume this is why Judge Piester commented that "the sentencing guidelines don't apply . . . ." (Filing 38, at 14.) However, and as indicated earlier, the Guidelines did apply to the Lacey Act violations which were Class A misdemeanors. To the extent Judge Piester thought that the Guidelines did not apply to the Lacey Act violations, he was in error. If there was such an error, the defendants were not harmed because Judge Piester's sentences under the Lacey Act were within the Guideline range.

**18.** The next sentence states: "In the absence of an applicable sentencing guideline in the case of an offense *other than a petty offense,* the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission." *Id.* (emphasis added). A "petty offense" is a Class B or C misdemeanor or an infraction. 18 U.S.C. § 19. Since the foregoing language from the statute does not pertain to "petty offenses," the Class B misdemeanor sentences reviewed in the text are not subject to this part of the statute.

with the factors outlined in 18 U.S.C. § 3553(a). *United States v. K.R.A.*, 337 F.3d at 978 (explicitly looking to "the applicable factors enumerated in 18 U.S.C. § 3553(a)" when determining whether the sentence was "plainly unreasonable" or an "abuse of [the court's] broad discretion"). In other words, if an objectively reasonable judge could conclude that the sentence under review is consistent with the factors described in 18 U.S.C. § 3553(a), then the sentence must be affirmed under the "plainly unreasonable" standard even though another judge might impose a very different sentence.

At last, then, we come to a review of the sentences. It is clear that they are fair and not "plainly unreasonable" or an abuse of discretion. Judge Piester adopted, with downward modifications, the thoughtful sentencing recommendations of the probation officer. (*Compare* Filing 38 *with* Filings 24 & 25 under "Justification".) Those recommendations, and Judge Piester's sentences, were centered upon community service at wildlife centers [19] and significant fines. In turn, those components were consistent with the need to punish, deter, and educate the defendants, but the sentences were no more harsh than necessary to accomplish these goals. *See* 18 U.S.C. § 3553(a)(2)(A), (B) & (D). In this regard, I make the following specific observations:

    * The length of probation was obviously determined by the need to provide the defendants with sufficient time to complete their community service without unduly impinging upon their ability to go about the rest of their lives. The manner and length of community service was structured to be educational to the defendants, but not onerous. Kilpatrick could complete his community service of 250 hours by spending less than two hours a week volunteering at a wildlife center. It would take Ross even less time. Indeed, Judge Piester told the men that if they completed their community service early, he would consider terminating their probation. (Filing 38, at 15.)

* The hunting ban was suggested by the probation officer. (Filings 24 & 25 ("Justification").) The ban was consistent with the community service requirements and directly responsive to the men's criminal conduct. In particular, the ban served a legitimate punishment and deterrent need. Moreover, the men could avoid the three-year hunting ban by completing their probation more rapidly than required and it thus provided a good incentive to successfully complete the probation and related community service.

* The fines were stiff, but well below the statutory maximums. Moreover, the fines that Judge Piester imposed were less than those suggested by the probation officer. (Filings 24 & 25.) Still further, both men had the ability to pay the fines as demonstrated by the fact that Kilpatrick had a positive net monthly cash flow of over $2,300 and a positive net worth (filing 20 ¶ 52), and Ross had gross monthly earnings of $6,400 and a positive net worth. (Filing 21 ¶¶ 51 & 53) While the fines are very painful,[20] they are not ruinous.

19. The probation office recommended that Kilpatrick do his community service at various places such as the Riverton Wildlife Area. (Filing 24 ("Justification").) The probation officer recommended that Ross do his community service at various places such as the Rocky Mountain Arsenal National Wildlife Refuge. (Filing 25 ("Justification").)

20. The fines would hurt Ross in particular. While he had a positive net worth and significant gross monthly earnings from self-employment, he had trouble servicing his busi-

Both men argue that they could have avoided the significant fines, probation, and community service by paying the relatively small fines listed on the citations and not contesting their guilt. They emphasize that those fines are substantially less than the fines Judge Piester imposed. (Filing 1 (citations under "Collateral").) I assume that they are correct, but I fail to grasp the significance of the argument. The defendants cite no authority for the proposition that I should measure the reasonableness of Judge Piester's sentence against what the government was willing to take if the men decided to plead guilty and pay an agreed-upon fine. Under the law, the government was entitled to offer the men a good deal in exchange for their admission of guilt without constraining Judge Piester's discretion should the men decide to contest their guilt and put the government to the significant time and expense of a trial.

Ross additionally argues that the sentences were excessive when his actions are compared to Kilpatrick's behavior. He emphasizes that he did not shoot the deer.[21] That difference acknowledged, Judge Piester treated the men differently. The total fine he imposed against Ross ($3,000) was less than the total fine ($3,500) he imposed against Kilpatrick. Moreover, the community service imposed upon Ross (150 hours) was substantially less than the community service (250 hours) imposed upon Kilpatrick. In short, Ross has nothing to complain about.

### III.

Although I have many other things to do, I have spent a good deal of time on these misdemeanor appeals. In part, I have done so because Mr. Kilpatrick and Mr. Ross, otherwise law-abiding citizens, need to know that their appeals have been fully considered. Additionally, I wish to make clear that violations of our nation's wildlife laws is serious business, and I hope this opinion makes that point.

IT IS ORDERED that the appeals are denied; the judgments of conviction and sentences are affirmed; the stays pending appeal are dissolved; the defendants are directed to contact their supervising probation officers to begin service of their sentences; and judgment will be entered by separate document.

### JUDGMENT

Pursuant to the memorandum and order entered this date,

JUDGMENT is entered for the United States and against both defendants providing that: the appeals are denied; the judgments of conviction and sentences are affirmed; the stays pending appeal are dissolved; and the defendants are directed to contact their supervising probation officers to begin service of their sentences. Costs are taxed to the defendants.

---

ness debt on a monthly basis, as he was trying to pay it by using a credit card. (Filing 21 ¶¶ 51 & 53.)

21. Ross glosses over other facts tending to indicate comparable culpability such as his involvement with the Colorado taxidermist.